T.C. Memo. 2005-227


UNITED STATES TAX COURT


ROGER AND SHARON WORTMANN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21534-03, 21535-03,    Filed September 29, 2005.
          21536-03, 21537-03.


<u>Gerald P. Laughlin</u>, <u>Kent O. Littlejohn</u>, and <u>Francis J.</u>
<u>Reida</u>, for petitioners.

<u>David W. Sorensen</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes for 1999 and 2000 in the
following amounts:

---

[1]This case is consolidated for briefing, opinion, and trial
with Michael J. and Leslie A. Cain, docket No. 21535-03, Steven
L. and Nancy E. Archbold, docket No. 21536-03, and William J. and
Janice L. Hesse, docket No. 21537-03.

| Petitioners | 1999 Deficiency | 2000 Deficiency |
|-------------|-----------------|-----------------|
| Wortmann | $12,864 | $12,536 |
| Cain | 13,712 | 10,193 |
| Archbold | 18,655 | 11,347 |
| Hesse | 15,530 | 14,431 |

We are asked to decide the fair market value of land near Oakdale, Nebraska, improved with a chapel, monastery, and dormitory (the retreat center) for purposes of determining the amount of the allowable charitable contribution deduction under section 170.[2] Petitioners determined that the retreat center had a value of $475,000[3] at the time of contribution, and deducted charitable contributions accordingly. Respondent determined that the retreat center had a value of $76,200 at the time of contribution. We hold that the fair market value of the retreat center at the time of contribution was $76,200.

---

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[3]Of the $551,272 total charitable contribution deductions petitioners claimed on their respective tax returns, respondent does not dispute $76,082, representing the value of the personal property within the buildings of the retreat center. The parties stipulated that $475,000 was at issue, which is also the value of the retreat center property determined by petitioner's expert. We assume this to be an approximation of the $475,190 result of subtracting the agreed valuation of the personal property from the total charitable contribution deductions. Petitioners' deductions of $76,082 attributable to the personal property within the buildings are therefore not at issue. We focus solely on the real estate value of the retreat center.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioners Roger and Sharon Wortmann resided in Hartington, Nebraska, at the time they filed their petition. Petitioners Michael J. and Leslie A. Cain resided in Bloomfield, Nebraska, at the time they filed their petition. Petitioners Steven L. and Nancy E. Archbold resided in Bloomfield, Nebraska, at the time they filed their petition. Petitioners William J. and Janice L. Hesse resided in Yankton, South Dakota, at the time they filed their petition.

### The Monastery

In the late 1970s, Father Clifford Stevens, a Catholic priest, was serving as the pastor for a church in Neligh, Nebraska. Father Stevens had dreamed of building a monastery and looked in many places for the right piece of land on which to build the monastery.

In the early 1980s, Father Stevens found a 240-acre parcel of land about 10 miles from Neligh, Nebraska, near Oakdale, Nebraska, that he considered perfect for the monastery. Father Stevens received permission from the Archbishop of Omaha (Archbishop) to build a monastery on the land and arranged for incorporating a nonprofit organization, called the Monks of Tintern, Inc. (Monks Nonprofit), to obtain the land. The Monks Nonprofit obtained the land and constructed a barn-shaped monastery and a chapel.

While Father Stevens was in residence at the monastery, the Monks Nonprofit was able to pay its bills. The Monks Nonprofit borrowed money from a bank to build the monastery building and obtained a bequest to cover much of the construction debt. The Monks Nonprofit also accepted donations but did not solicit them. To avoid burdening the Catholic Church, the Catholic Church required that the monastery show its financial stability before accepting monks in residence. Although the Monks Nonprofit was able to pay its bills, the Monks Nonprofit was unable to show sufficient ability to operate financially independently to meet the standard required by the Catholic Church. As a result, the monastery never had any monks in residence, although a few people came to inquire about it.

In 1991, Father Stevens experienced some health problems and departed Nebraska for Nova Scotia, anticipating that he would die. He left the monastery in the hands of the Monks Nonprofit. The Archbishop became the president of the Monks Nonprofit, which meant that the Catholic Church had both legal and ecclesiastical responsibility for the monastery. The Archdiocese invited the Patrists, a religious group from Singapore, to move onto the property, and the Patrists accepted. The Patrists constructed a third building on the land, a two-story dormitory. The Patrists experienced conflicts within their group, and the Archdiocese forced the Patrists to vacate the premises in about 1994.

Faced with the possibility that no religious order was willing and able to occupy the premises, the Archdiocese

considered selling the property to the Oak Creek Ranch, which was a for-profit enterprise located next to the subject property. Father Stevens, still in Nova Scotia, heard about this possibility and was horrified that the land might be used for a nonreligious purpose. Father Stevens considered it sacrilege to have the land sold for nonreligious purposes after people had made numerous donations and contributed so much personal effort to the monastery. Father Stevens wrote to the Archbishop and obtained permission to return to Nebraska in 1995 to take care of the monastery. Although he had expected to die, his health had apparently improved to the extent he was able to return to Nebraska, resume the presidency of the Monks Nonprofit, and assume the duties related to the monastery.

On his return, Father Stevens found the monastery in financial disarray. The Monks Nonprofit had continued to receive some donations, but it began experiencing difficulty in keeping current on its outstanding debt. Although the Monks Nonprofit was continuing to pay the debts in the ordinary course, it was becoming increasingly difficult to keep current with the payments owed. Father Stevens realized that all of the monastery's assets had to be liquidated to pay the liabilities. Father Stevens agreed with the Archdiocese in the summer of 1996 that the property would be sold to pay the debts of the Monks Nonprofit.

In September 1996, Father Stevens sold 210 acres of the land to an unrelated third party for $63,000. This left only the 30 acres around the monastic structures for the Monks Nonprofit to

sell. (These 30 acres and the three structures on the 30 acres shall be referred to collectively as the subject property.) Father Stevens also arranged an auction of personal property inside the buildings, such as the toilet fixtures, to raise money to pay the debts of the Monks Nonprofit.

Father Stevens began communicating to people in the community that the subject property was for sale to buyers who would use it for religious purposes and inquired of a local convent whether the convent might be interested in purchasing the subject property. Father Stevens also informed the attorney for the Monks Nonprofit that the subject property had to be sold. Father Stevens stated that the subject property should be sold at a price that would permit all the debts to be paid plus provide a little seed money for future endeavors. To preserve the property's religious purpose, Father Stevens insisted on a contractual right giving the Monks Nonprofit the first opportunity to repurchase the land if the purchaser wanted to resell it.

Father Stevens testified that he did not want the Monks Nonprofit to sell the property to a buyer that would use it for nonreligious purposes. He further testified that he would have caused the Monks Nonprofit to find another way for the Monks Nonprofit to pay its bills rather than sell the property. Father Stevens also testified he would have had the Monks Nonprofit give the property away to a group that would use it for religious

purposes, if that were the only way to ensure the property would retain its religious purpose.

Sale of the Monastery

Father Stevens met Steven Archbold (Mr. Archbold), one petitioner, when Mr. Archbold attended a retreat at the property in January 1997. At the time, Mr. Archbold was studying to be an ordained deacon in the Catholic Church.[4] Father Stevens showed the retreat attendees around the property and told them that the subject property was for sale.

Father Stevens told Mr. Archbold that the subject property would be sold for an amount to cover debts of the Monks Nonprofit that approximated $75,000. Mr. Archbold thought the geographical isolation of the retreat center property would be perfect for the religious education of junior high and high school students to whom he taught confirmation classes and other religious classes. Mr. Archbold thought the secluded location could help his students focus on spiritual growth. Mr. Archbold decided to talk to other members of his church community to see whether they concurred with his idea.

The other petitioners, Michael Cain, Roger Wortmann, and William Hesse, informed Mr. Archbold that they and their wives would be interested in purchasing the subject property with him. The four husbands and wives formed Tintern Retreat Center, LLC (TRC) and each family became a 25-percent member of TRY. On May 22, 1997, TRY purchased for $75,000 the subject property and any

---

[4]Mr. Archbold was ordained as a deacon in 1999.

remaining personal property inside the buildings that had not been sold at auction.  TRY granted the Monks Nonprofit a right of first refusal on the subject property, as Father Stevens wished, which gave the Monks Nonprofit the right to repurchase the property if TRY were ever to offer the subject property for sale.

After TRY acquired the subject property, petitioners located a separate, rural group of deacons to operate the subject property.  This group of deacons incorporated their operation under the name Tinter Retreat & Resource Center, Inc. (TRRC).  TRRC applied for and received a determination from respondent that it operated as a section 501(c)(3) organization.  TRY leased the subject property to TRRC for $1, and TRRC operated it for approximately 17 months.  During this time, TRRC painted the buildings, replaced carpeting, maintained the outside of the structures, created separate sleeping areas for men and women, completed the bathrooms, and added various sports fields.  These improvements were essentially for general maintenance and upkeep.  Neither TRY nor petitioners individually expended any time or money to make any structural improvements or additions to the subject property.

On October 29, 1998, TRY donated the subject property to TRRC.  TRY claimed a charitable contribution of $475,000 for the subject property.[5]  In connection with donating the subject property to TRRC, Mr. Archbold suggested to a TRRC board member

---

[5]TRC also claimed a charitable contribution of $76,082 for the personal property inside the subject property buildings, which is not at issue here.

that an appraisal of the subject property be obtained. TRRC retained Keith White (Mr. White) of White Realty & Appraisal to perform an appraisal of the property that was attached to TRC's information tax return, Form 1065, U.S. Partnership Return, for 1998.

Deductions at Issue

TRY claimed a charitable contribution of $475,000 with respect to the subject property, although TRY purchased the subject property for $75,000 just 17 months before the date of donation. TRY included each petitioner husband and wife's respective portion of this charitable contribution on their respective Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., for 1998.

Petitioners in each docket filed joint tax returns for 1998 and claimed their proportionate share of TRC's $475,000 charitable contribution deduction for 1998, up to the statutory limit of 30 percent of adjusted gross income. Sec. 170(b)(1)(F), 170(b)(1)(B)(I). Petitioners carried forward the remaining portion of the charitable contribution and deducted portions on their joint tax returns for 1999 and 2000, the years at issue in this case.

Respondent issued deficiency notices to petitioners for 1999 and 2000 on September 16, 2003, in which respondent determined the subject property had a value of $76,200, rather than the $475,000 claimed by petitioners. Respondent accordingly partially disallowed petitioners' deductions for the charitable

contribution that petitioners each carried forward to 1999 and 2000.  Petitioners timely filed petitions claiming that respondent erred in reducing the $475,000 valuation to $76,200, even though they, through TRY, had paid $75,000 for the subject property[6] only 17 months before the date of donation.

OPINION

The sole issue in this case is the fair market value of the subject property on October 29, 1998, the date TRY donated the subject property to TRRC.  Respondent asserts the subject property had a value of $76,200, while petitioners maintain the subject property had a value of $475,000, even though they, through TRY, purchased the subject property and personal property 17 months earlier for $75,000.  We begin with the burden of proof.

I.  <u>Burden of Proof</u>

In general, the Commissioner's determinations in the deficiency notice are presumed correct, and the taxpayer bears the burden of proving that the Commissioner's determinations are in error.  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  The burden of proof may shift to the Commissioner under certain circumstances, however, if the taxpayer introduces credible evidence and establishes that he or she substantiated items, maintained required records, and fully cooperated with the

---

[6]We note that petitioners paid $75,000 for the subject property plus personal property that remained.  The personal property component is not in dispute.

Commissioner's reasonable requests.  Sec. 7491(a)(2)(A) and (B).[7]

Here, both parties have presented evidence and introduced expert

witness reports.  We therefore decide the case based on the

preponderance of evidence without regard to the burden of proof.

See Blodgett v. Commissioner, 394 F.3d 1030 (8th Cir. 2005),

affg. T.C. Memo. 2003-212; Polack v. Commissioner, 366 F.3d 608,

613 (8th Cir. 2004), affg. T.C. Memo. 2002-145.

II.  Rules on Valuation

We next address the value of the subject property at the

date of contribution to the charitable organization to determine

the charitable contribution deduction amount.  Section 170

generally permits a deduction for contributions made to

charitable institutions, subject to restrictions not at issue

here.  With respect to a contribution of property other than

money, the amount of the contribution is the fair market value of

the property at the time of contribution.  Sec. 1.170A-1(c)(1),

Income Tax Regs.  Fair market value is the price at which the

property would change hands between a willing buyer and a willing

seller, neither being under any compulsion to buy or sell and

both having reasonable knowledge of relevant facts.  Sec. 1.170A-

1(c)(2), Income Tax Regs.

---

[7]Sec. 7491 is effective with respect to court proceedings
arising in connection with examinations by the Commissioner
commencing after July 22, 1998, the date of enactment of the
Internal Revenue Service Restructuring and Reform Act of 1998,
Pub. L. 105-206, sec. 3001(a), 112 Stat. 726.

While fair market value is a question of fact to be determined from the entire record, we were presented with four valuations of the subject property.  See Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Three find fair market values of the subject property that are close to one another, approximating $75,000, while one valuation, which appraisal analysis and methodology we find troubling, is an outlier.  We consider and evaluate each of these value determinations in turn.  We first address the purchase of the subject property by petitioners, through TRY, on May 22, 1997, just 17 months before TRY contributed it to a qualifying charitable organization on October 29, 1998.

A.  Prior Sale of the Property

We note that evidence of what property sold for within a reasonable time before the valuation date generally is competent, substantial, and persuasive evidence of its fair market value on the valuation date.  Douglas Hotel Co. v. Commissioner, 190 F.2d 766, 772 (8th Cir. 1951), affg. 14 T.C. 1136 (1950).  Actual sales between a willing buyer and a willing seller are generally more reliable than estimates and approximations and indicate what a hypothetical buyer and seller may agree on.  Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989).  Windows of time between the valuation date and the sale date have been found to be reasonable under some circumstances, even when they are as long as 15 months or 2 years.  See, e.g., Estate of Kaplin v. Commissioner, T.C. Memo. 1986-167 (2-year window), revd. on

another ground 815 F.2d 32 (6th Cir. 1987); Estate of Shlensky v. Commissioner, T.C. Memo. 1977-148 (15-month window).

As fair market value is a factual determination and necessarily inexact, evidence of the price obtained at a recent arm's-length sale may be extremely probative.  See Estate of Keitel v. Commissioner, T.C. Memo. 1990-416 (citing Ambassador Apartments Inc. v. Commissioner, 50 T.C. 236, 244 (1968), affd. per curiam 406 F.2d 288 (2d Cir. 1969); Messing v. Commissioner, 48 T.C. 502, 512 (1967); Estate of Schroeder v. Commissioner, 13 T.C. 259, 263 (1949)).  The weight given to an actual sale price is greatly diminished, however, where a material change in circumstances occurs between the valuation date and the date of sale.  See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1233 (1987).

We find that petitioners' purchase through TRY of the subject property for $75,000 is persuasive evidence of the fair market value of the subject property.  Petitioners were willing buyers, and the Monks Nonprofit through Father Stevens was a willing seller.  Petitioners' purchase of the subject property was also within a reasonable time, approximately 17 months, before the donation to the charitable organization.  Further, there is no evidence of a material change in the subject property between the valuation date and the date of purchase that would cause us to diminish the weight of this evidence.  In fact, very few alterations, only general cleaning and repair-type improvements, were made to the subject property in the

intervening 17 months before petitioners contributed the subject property to a qualifying charitable organization.  These alterations included painting, maintaining the outside of the structures, and completing the bathroom and sleeping areas. Neither TRY nor petitioners individually spent any time or money on structural improvements or additions to the subject property.

Petitioners argue that the $75,000 purchase price is not persuasive because it was a "forced sale".  We disagree. Although Father Stevens testified that he wanted the property to sell at a price to pay the debts plus a little seed money, there is no evidence of any foreclosure activity or that any creditor had begun any collection action.  In fact, although the Monks Nonprofit was experiencing difficulty paying bills and needed to liquidate its assets, the Monks Nonprofit was continuing to make payments on the debt when due in the ordinary course of business. Further, we are mindful that Father Stevens expressed that the subject property must retain its religious purpose.  In fact, Father Stevens testified that he would have preferred that the Monks Nonprofit not have sold the subject property at all if there was a risk the subject property would be used for nonreligious purposes.  In that case, Father Stevens testified that he would have found another way for the Monks Nonprofit to pay its liabilities.

The evidence in this case shows that Father Stevens, through the Monks Nonprofit, was a willing seller. The Monks Nonprofit would sell at the right price, provided that the purchaser would use the subject property for religious purposes. If no purchaser came along who would use it for religious purposes, Father Stevens was prepared to have the Monks Nonprofit keep the subject property. It turned out, however, that TRY, an unrelated party, did come along and was willing to meet the Monks Nonprofit's conditions and offered a price that the Monks Nonprofit was willing to accept. The Monks Nonprofit was not an entity forced to sell at a depressed value because aggressive creditors were closing in. It found a purchaser who was willing to accept the conditions and who offered to pay a price that the Monks Nonprofit was willing to accept. Hence, we find that the May 1997 sale was between a willing buyer and seller.

In sum, we find the sale of the subject property to be probative evidence of the value of the subject property. We shall consider this evidence along with the other evidence of valuation in reaching our conclusion, bearing in mind the conditions the Monks Nonprofit placed on the subject property. On balance, however, we do not find these conditions significantly affected the ultimate purchase price of the property. The valuations of the Antelope County assessor and respondent's expert, both of which are reasonably close to the purchase price, corroborate our finding.

B.  Respondent's Expert's Appraisal

Respondent's expert's appraisal, which found that the fair market value of the subject property at the time of contribution was $90,000, corroborates the purchase price as a persuasive indication of the fair market value of the subject property. Respondent engaged William C. Fischer (Mr. Fischer) to perform an appraisal of the subject property as of the date of contribution. Mr. Fischer, who has been a real estate appraiser for 45 years, is MAI[8] certified and Nebraska certified.  Mr. Fischer completed 60 hours of education every 3 years to retain his MAI certification.  During his career, he has performed between 4,500 to 5,000 independent appraisals of commercial properties in 15 different States.  In addition, Mr. Fischer has experience in appraising religious property, which is typically considered special use property, including approximately 16 to 20 churches as well as a mission area.  Mr. Fischer also has experience in appraising special use property, such as event centers and school buildings.

We find Mr. Fischer's appraisal to be thoughtful and credible, and it closely corroborates the prior sale in determining the fair market value of the property at the time of

_____

[8]MAI is a designation awarded to qualifying members of the American Institute of Real Estate Appraisers and within the appraisal community is viewed as the most highly regarded appraisal designation.  See Estate of Auker v. Commissioner, T.C. Memo. 1998-185.

contribution.[9]  Mr. Fischer used two of the three traditional approaches to property valuation in his report, determining that the income approach was not appropriate under the circumstances.[10]

Mr. Fischer used the sales comparison approach to estimate the price the subject property would bring in a sale, based on an analysis of comparable market transactions.  Under this approach, comparable market transactions are identified and adjusted to account for differences of market conditions, size, location, physical features, and other factors.  American Institute of Real Estate Appraisers, The Appraisal of Real Estate 417, 422-423 (12th ed. 2001).  Mr. Fischer identified two sales of property comparable to the subject property for his analysis.  One of these comparable sales was the sale of the subject property to petitioners 17 months before the valuation date.  The other comparable sale was a sale of a 15.89-acre monastery in Hastings, Nebraska, in 2000 for $65,000.  Mr. Fischer adjusted these

---

[9]We bear in mind that when TRC purchased the subject property, much of the personal property inside the buildings had already been sold by the Monks Nonprofit to pay their debt.  The purchase price paid by TRC included any remaining personal property, but respondent's expert's appraisal values the real estate alone.

[10]The income approach is most relevant to determine the value of income-producing property.  The income approach determines the value based upon the income stream that the property is anticipated to produce in the future.  American Institute of Real Estate Appraisers, The Appraisal of Real Estate 471 (12th ed. 2001).  Annual income and expenses are projected and the difference between projected income and expenses is discounted to present value to compensate for the risk and the waiting period before the owner receives the income.  Id. at 491-495.

comparable sales to account for differences in construction, age, condition, and size, and derived an indicated value of $90,000 for the subject property under the sales comparison approach.

Mr. Fischer also used the cost approach to value the subject property as of the date of contribution. The cost approach evaluates what it would cost to build the subject property at today's cost. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 349 (12th ed. 2001). This cost is then adjusted to account for depreciation.[11] Id. at 349.

Under the cost approach, Mr. Fischer used the Marshall-Swift valuation service to derive a 1998 value of the improvements of approximately $533,000, and adjusted this value for physical depreciation, functional obsolescence, and economic obsolescence. After these adjustments, Mr. Fischer concluded that the value of the improvements under the cost approach was approximately $80,000. Mr. Fischer relied on six different sales of vacant land under the cost approach to arrive at the land value of the subject property as if it were vacant. Based on these six sales, Mr. Fischer derived a land value of the subject property of approximately $32,000. He then combined the land value as if vacant with the depreciated cost of improvements to derive a

---

[11]Appraisers find the cost approach to be most useful when buildings are relatively new. Id. at 354. Depreciation is a subjective determination, and an evaluation of property with older, more depreciated buildings therefore becomes more subjective as larger amounts are subtracted for depreciation. Id. at 357. As noted by respondent's expert in his report, appraisers find that the cost approach tends to set the upper limit of value because no property would be worth more than what it would cost to build another property of equal utility.

value of approximately $112,000 for the subject property under the cost approach.

Based on the values that he found under the sales comparison approach and the cost approach, Mr. Fischer concluded that the fair market value of the subject property was $90,000 as of the date of contribution. In his analysis, Mr. Fischer gave more weight to the sales comparison approach than the cost approach because he was able to rely on two comparable sales that, in his opinion, were indicative of value and determined, as noted, that the cost approach tended to set the upper limit of value. Thus, he found that the property would generally not be worth more than $112,000 but that $90,000 was a more appropriate value based on the facts of this particular situation.

In sum, we place significant weight on the valuation conclusions of Mr. Fischer, respondent's expert. Respondent's expert is experienced in the valuation of properties comparable to the subject property, and we are impressed by the thoroughness of his analysis and conclusions respecting the subject property. We also note that the $90,000 value determined by respondent's expert is quite close to the prior purchase price of the subject property and tends to corroborate the prior purchase price as evidence of the valuation of the subject property.

C.  Petitioners' Expert's Appraisal

We now address the conclusions of petitioners' expert, who determined the subject property's value to be $475,000, on the date of contribution.  We find this valuation conclusion problematic and give it considerably less weight.  TRRC engaged Mr. White to perform an appraisal of the subject property as of the contribution date.  Mr. White is a certified real estate appraiser located in Neligh, Nebraska, where he has lived his entire life.  He has had his appraiser's license since 1976 and his general certified appraiser's license since 1993.

The evidence in this case does not fully establish the independence of Mr. White.  TRRC, not TRY, retained Mr. White, at the suggestion of Mr. Archbold.  It was not explained at trial why the donee, rather than the donor, hired the appraiser, and no one testified why or how Mr. White was the appraiser chosen.  Lacking any evidence to answer these questions, we cannot evaluate and satisfy ourselves that Mr. White's valuation opinion was truly independent.  We are troubled by the circumstances under which Mr. White was retained and also by his analysis and conclusions.  These concerns lead us to give significantly less weight to Mr. White's conclusions of value.

Mr. White used two of the three traditional approaches to value in his appraisal.  As with Mr. Fischer's appraisal for respondent, Mr. White also did not rely upon the income approach as the subject property was not income-producing property.

Under the sales comparison approach, Mr. White valued the land only, not the land and improvements. Mr. White identified three sales of property to use as comparable sales, all of vacant land located in or around Neligh or Oakdale, Nebraska, and all purchased for special uses. These special uses included a transformer site, fertilizer plant and storage, and commercial sales and inventory storage. None of Mr. White's comparable sales involved agricultural land or pasture, even though approximately half of the subject property was agricultural land or pasture. Mr. White also did not include the May 1997 sale of the subject property to petitioners through TRY, nor the sale of the 210 acres of the retreat center property sold for $63,000 in 1996. Mr. White did not include the 1997 sale because he considered the subject property sold for less than what it was worth. Mr. White failed to explain, however, why he considered the subject property sold for less than what it was worth in May 1997. We question this omission.

We are also concerned by Mr. White's reasoning that the prior sale of the subject property should not be included as an indication of value. Mr. White's subjective determination that the property sold for less than it was worth is not sufficient to disregard a prior sale of the exact property to be valued that occurred only 17 months earlier. While property valuation is admittedly inexact, Mr. White's subjective determination to exclude this particular comparable sale, that of the subject

property itself, with no further explanation or analysis, causes us considerable concern.

Mr. White adjusted the sales prices of the comparable properties to account for differences between the comparable properties and the subject property. Based on his assessment of the comparable sales, Mr. White concluded under the sales comparison approach that the subject property had an adjusted land value of $2,000 per acre and that the subject property's value was $59,800 for the land alone as of the date of contribution.

Under the cost approach, Mr. White, like Mr. Fischer, used the Marshall-Swift method to find the value of the buildings new and then adjusted the value of each structure to account for physical depreciation. Unlike Mr. Fischer, however, Mr. White did not adjust the building value for physical or economic obsolescence. We question why Mr. White did not discount the value for economic and functional obsolescence. Mr. White admitted at trial that economic obsolescence included the inability to operate the property economically, and Mr. White knew that the subject property could not be operated as a monastery on a cost effective basis based on the experiences of the Monks Nonprofit.[12] Yet, faced with these circumstances, Mr. White did not adjust his values for economic obsolescence.

---

[12]About 18 of the 30 acres of the subject property are dry cropland and about 12 acres are pasture. Mr. White testified that he did not believe hunting, farming, or ranching uses of the subject property would be profitable either.

Similarly, Mr. White was aware that the subject property was designed as a monastery and knew the subject property was sold because it was not self-supporting as a monastery. Despite this overwhelming evidence, Mr. White did not adjust his values for functional obsolescence. We believe Mr. White's valuation under the cost approach does not appropriately account for these essential elements.

Mr. White concluded under the cost approach that the value of improvements to the subject property was approximately $414,000. Mr. White then added this value of the improvements under the cost approach to the value of the land he found under the sales comparison approach to conclude that the fair market value of the subject property was $475,000 as of the contribution date.

Mr. White's methodology and omissions trouble us. We believe that respondent's expert's methodology is more thorough and consistent with appraisal methodology. Respondent's expert relied on two separate analyses of the subject property, one under the sales comparison approach and one under the cost approach, instead of applying each approach to value a portion. Respondent's expert then compared and reconciled the value conclusions under each approach to reach one overall conclusion of value, ultimately deciding to give more weight to the sales comparison approach. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate 65, 598-603 (12th ed. 2001). Accordingly, we place less weight on petitioners'

expert's conclusions as to the value of the property as of the contribution date.

   D.   Assessed Value of Subject Property

   We now address the assessed value of the subject property. The assessed valuation of property is also evidence of the property's value where, as is the case in Nebraska, the assessed value is defined as the property's fair market value.  See N. Trust Co. v. Commissioner, 87 T.C. 349, 382 (1986); Neb. Rev. Stat. sec. 77-112 (1996 & Supp. 2000).  Assessed valuation may be used to corroborate fair market value determined under the three traditional approaches.  See N. Trust Co. v. Commissioner, supra.

   Here, the Antelope County assessor determined that the assessed value of the subject property for 1998 was $70,424.  The assessment took into account physical depreciation, economic obsolescence, and functional obsolescence in valuing the property.

   We place great weight on the assessed value of the subject property because it corroborates the actual sale and the valuation of respondent's expert as indicators of the fair market value of the subject property.  This unrelated third party valuation, close to the values in the prior sale and determined by respondent's expert, reinforces our view that the purchase price of the property is persuasive evidence of its true fair market value.[13]

--------

[13]Petitioners contend that the value the Antelope County assessor determined is somehow biased and the assessor was simply
(continued...)

III. <u>Valuation of the Subject Property</u>

For the reasons stated above, we find that the most persuasive evidence of the subject property's value as of the contribution date is the actual sale of the subject property 17 months before the contribution. We also find that the record justifies a slight upward adjustment to account for the minor maintenance and upkeep that occurred between the purchase date and the contribution date. This adjustment is also warranted by the slightly higher ultimate value conclusion of respondent's expert. We therefore find that the record supports a valuation of $76,200 as of the date of contribution.

We further find that the record does not support petitioners' position that the subject property was worth $475,000 at the time of contribution. As explained previously, we found the sale by Father Stevens through the Monks Nonprofit to petitioners was between a willing buyer and seller, not a "distressed" sale. We also place no weight on petitioners' accusation that the Antelope County assessor was somehow inappropriately affected by the actual sale price and correlated the assessed value with the sale price, rather than making an independent determination. Finally, we cannot disregard the

---

[13](...continued)
attempting to hit a mark of the purchase price. We find this contention unfounded. To the extent the Antelope County assessor considered the prior sale of the subject property when performing the valuation, we find the assessor simply considered it, much as we do, relevant to determine the fair market value. We do not find that the 1997 sale of the subject property improperly controlled the assessor's valuation in any way.

conclusions of respondent's expert, an MAI certified appraiser with significant experience appraising property similar to the subject property.

Instead, we have relied on three evidentiary bases showing the determinations of value of the subject property, all of which we find to be credible. The actual sale price, respondent's expert's valuation, and the Antelope County assessment are reasonably close in their ultimate conclusions of value. Petitioners' valuation is the only outlier and is based upon an expert opinion we find dubious and not well supported by valuation methodology. We find that Mr. Fischer's report provides a better indication of the fair market value. It is well reasoned and thorough. In addition, it is consistent with the previous purchase of the subject property 17 months before the valuation date, and the assessed value of the subject property corroborates this value.

Accordingly, based on our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the fair market value of the subject property was $76,200 on the date of contribution. We therefore sustain respondent's determinations in each deficiency notice regarding the fair market value of the subject property.

To reflect the foregoing,

Decisions will be entered
for respondent.