# United States Tax Court

T.C. Memo. 2026-45

RISING ROCK PARTNERS, LLC, ROBERT SCHILL, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

EDGAR F. YOST, III AND DEBORAH A. YOST,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 23614-21, 33677-21.          Filed June 2, 2026.

————

*Anson H. Asbury, Aaron H. Finch, Robert B. Gardner III*, and *Ethan J. Vernon*, for petitioner in Docket No. 23614-21.

*Anson H. Asbury, Aaron H. Finch, Robert B. Gardner III, Ethan J. Vernon*, and *Andrew R. Vazquez*, for petitioners in Docket No. 33677-21.

*Keith Lawrence Gorman, Matthew D. Lucey*, and *Peyton E. Reed*, for respondent in Docket No. 23614-21.

*Keith Lawrence Gorman* and *Matthew D. Lucey*, for respondent in Docket No. 33677-21.

[*2]    MEMORANDUM FINDINGS OF FACT AND OPINION

GREAVES, *Judge*: These conservation easement cases involve noncash charitable contribution deductions claimed for 2017.[1] Rising Rock Partners, LLC (RRP), reported a $12,765,000 deduction for granting a perpetual conservation easement over 226.014 acres in Meriwether County, Georgia.[2] The deduction was premised on the asserted pre-easement value of $13,095,000 for the affected land. By Notice of Final Partnership Administrative Adjustment (FPAA), the Internal Revenue Service (IRS or respondent) disallowed RRP's deduction in full and determined that RRP is subject to an accuracy-related penalty under section 6662.[3]

Edgar F. Yost III and Deborah A. Yost reported a charitable contribution of $12,715,000 for granting a perpetual conservation easement over 191.984 acres in Meriwether County, and they deducted that amount over several tax years. The value of the Yosts' charitable contribution was premised on the asserted pre-easement value of $13,915,000 for the affected land. By Notice of Deficiency the Commissioner disallowed the Yosts' deductions in full and determined deficiencies and accuracy-related penalties under section 6662.

The issues for decision are (1) the fair market value of the conservation easement RRP donated and, on the basis of that valuation, (2) whether accuracy-related penalties under section 6662 apply to RRP or the Yosts. For the reasons below, we find that the easement value is $649,955 and that, as a result, the penalty applies.

---

[1] On August 23, 2024, the parties in the Yosts' case, docket No. 33677-21, filed a Stipulation to be Bound by the Rising Rock Partners, LLC, case, docket No. 23614-21, for purposes of determining (1) the Yosts' entitlement to the charitable contribution deduction for a qualified conservation easement and (2) the easement's fair market value. Accordingly, resolution of the Rising Rock Partners, LLC, case effectively determines the outcome of the Yosts' case. The remaining issues in docket No. 33677-21 relate to the applicability of penalties and any defenses to penalties. On December 12, 2024, we consolidated these cases for trial, briefing, and Opinion.

[2] In the light of the Yosts' Stipulation to be Bound, we use "petitioner" in the singular. Unless otherwise indicated, "petitioner" refers to RRP's tax matters partner, Robert Schill, LLC.

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                    FINDINGS OF FACT

The following facts are derived from the pleadings, the stipulation of facts with attached exhibits, as supplemented, and the testimony of fact and expert witnesses admitted into evidence at trial. RRP is a Georgia limited liability company classified as a partnership under the Tax Equity and Fiscal Responsibility Act[4] for its taxable year ending December 31, 2017. Petitioner, Robert Schill, LLC, was the tax matters partner for RRP during tax year 2017. Both entities had a principal place of business in Georgia when the petition was filed.

I.    *Meriwether County*

Meriwether County encompasses approximately 505 square miles in western Georgia, making it the state's 23rd largest county by land area. The county is predominately rural, and many local roads remain unpaved. Situated between Columbus and Atlanta, just east of LaGrange, Meriwether County has limited interstate access; only three miles of interstate highway pass through the county, and it has no interstate exit. Consequently, much of the population and commercial growth expanding outward from metropolitan Atlanta has bypassed the county.

Development in Meriwether County has been further constrained by infrastructure limitations, including limited availability of public sewer, water, and natural gas services. Although local officials have pursued economic development initiatives, these structural limitations have affected the pace and scale of private investment. In response, the county established the Industrial Development Authority (IDA) to encourage economic activity and assist prospective businesses and developers with permitting, zoning, rezoning, and related governmental processes. The IDA's efforts are intended to facilitate development opportunities that might otherwise be difficult to realize given the county's rural setting and infrastructure constraints.

A.    *Granite in Meriwether and Neighboring Counties*

Granite deposits are prevalent throughout Meriwether County and neighboring areas, including LaGrange. From at least 2005 through the valuation period, Vulcan Materials Co. (Vulcan) operated a

---

[4] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including RRP.

[*4] granite quarry in LaGrange.  Testimony from Keith Griggs, the plant manager for Vulcan's LaGrange and Columbus operations, established that the LaGrange facility primarily served local customers rather than large metropolitan markets like Atlanta, which are supplied by larger quarries located closer to that metropolitan area.

The LaGrange facility operated as a truck quarry, limiting the geographic range within which its product could be economically transported.  According to Mr. Griggs, demand for granite in the surrounding region was inconsistent, and the LaGrange operation historically functioned below full production capacity.  These market conditions created ongoing challenges in maintaining full-time employment for its workforce at the facility.

B.    *Community Pushback Against Mining Activities*

Although Meriwether County officials pursued economic development initiatives, those efforts often conflicted with residents' desire to preserve the county's rural character.  The record reflects significant community resistance to large-scale mining operations within the county.

The tension between economic development objectives and community opposition is illustrated by the experience of Jerry Fitzgerald, a commercial real estate developer from North Carolina, who sought to develop a crushed-stone quarry in Meriwether County beginning in 2017.  Mr. Fitzgerald identified a parcel for sale in the northeastern part of the county along State Route 85 and traversed by a railroad line (Randall property).  The Randall property was zoned for low-density residential use.

In 2017 Mr. Fitzgerald contacted the Meriwether County administrator regarding potential rezoning to permit mineral extraction on the Randall property.  County officials informed him that approval would require amending the zoning ordinance, and any amendment request would be reviewed by the Planning Commission followed by a vote by the Meriwether County Board of Commissioners (BOC).  Believing the county would support his proposal, Mr. Fitzgerald proceeded with the application process.

Before Mr. Fitzgerald applied to rezone the property from low-density residential to industrial with a special use for mining, he sought an amendment to the industrial zoning ordinance to add quarries as an allowable special use.  On February 27, 2018, Mr. Fitzgerald requested

[*5] a text amendment to allow rock quarries as a special use within industrial zoning districts. Shortly thereafter, he obtained an option contract to purchase approximately 759 acres making up the Randall property at $2,650 per acre. The option permitted geological testing but required zoning and permitting approvals before the seller could enforce the contract.

Following public notice of the proposed amendment, substantial opposition emerged. Hundreds of residents organized, submitting written objections to county officials and appearing at public hearings. After an initial public hearing, the Planning Commission unanimously recommended denial of the requested amendment. On April 11, 2018, the BOC held a public hearing at the county courthouse to accommodate the large opposition group. Following the hearing, the BOC voted to deny the proposed amendment permitting quarry operations.

Mr. Fitzgerald thereafter initiated litigation in the Superior Court of Meriwether County challenging the BOC's denial. On June 26, 2018, the court ordered the county to amend its zoning ordinance to allow for mining under restrictions and criteria that the county deemed appropriate. The court remanded the vote to the BOC for another hearing regarding the text amendment. At the August 28, 2018, BOC meeting, the same opposition group returned and continued to pressure the BOC. The BOC voted to amend its zoning ordinance to allow mineral extraction operations in an industrial zoning district as a special use approval. Despite the June 26, 2018, court order, one BOC member voted to deny the amendment while another abstained from voting.

The next day, Mr. Fitzgerald applied to rezone the Randall property to industrial with a special use for mining. The rezoning application was supported by detailed engineering, environmental, traffic, and economic studies. Mr. Fitzgerald spent approximately $225,000 to $250,000 in legal and consulting fees related to his rezoning efforts. The opposition group likewise retained counsel, commissioned expert reports concerning blasting and environmental impacts, and organized public opposition.

After reviewing Mr. Fitzgerald's rezoning application under the factors required by the zoning ordinance, the Meriwether County planning staff recommended denying the rezoning application, and the Planning Commission unanimously adopted that recommendation. In October 2018 the BOC held another public hearing that again drew a large crowd in opposition, and it unanimously denied the rezoning

[*6] request. Mr. Fitzgerald again challenged the decision in superior court. On May 1, 2019, the court affirmed the county's denial. Because the option contract on the Randall property had already been extended multiple times, Mr. Fitzgerald elected not to pursue further appeals and abandoned plans to develop a quarry at the site.[5]

## II. *Rising Rock Transaction*

### A. *The Players*

#### 1. *The Yosts*

Edgar "Ned" F. Yost III and his wife Deborah A. Yost long aspired to acquire a large tract of rural property with a lake where they could fish, hunt, and spend time with their family. The tranquil lifestyle they envisioned stood in contrast to the demands that had defined much of Mr. Yost's professional career.

Mr. Yost attended junior college for two years before being drafted and signed by the New York Mets, beginning a professional baseball career that spanned nearly seven years. Following his playing career, Mr. Yost transitioned into coaching, including four years as the third base coach for the Atlanta Braves. He later served as manager of the Milwaukee Brewers from 2003 through 2008. During his tenure with the Brewers, Mr. Yost spent much of the season traveling while Mrs. Yost maintained the family residence in Georgia. After he left the Brewers in 2008, the Yosts began pursuing their longstanding goal of acquiring recreational land. On February 5, 2009, they purchased 203.58 acres in Meriwether County for $1,122,000.

Mr. Yost returned to professional baseball in 2010 as manager of the Kansas City Royals. Although he experienced success with the Brewers, his greatest professional achievement came with the Royals' 2015 World Series championship. As Mr. Yost's professional success grew, so too did the family's Georgia landholdings. The Yosts acquired an additional 247.35 adjoining acres in 2011 for $989,404 and another 219.31 adjacent acres in 2013 for $822,405. Each purchase was

---

[5] Petitioner introduced evidence of a 2006 rezoning application in Meriwether County in which Greenbow, LLC, sought industrial zoning and a conditional use permit to develop a solid waste landfill on approximately 698 acres of residential and agriculture land. We assign this evidence little weight. The proposed landfill involved a materially different industrial use and occurred more than a decade before the RRP transaction, limiting its relevance to the property's highest and best use as of the valuation date.

[*7] negotiated at arm's length with unrelated parties. Collectively, the assembled 670.24 acres are referred to as the "Yost property."

The Yost property functioned primarily as a family retreat. Mr. Yost hunted deer there with his children, constructed a small barn, and used the land during the baseball offseason as a respite from the demands of managing. Approximately 20 acres were later developed into a motocross practice course for the Yosts' son, Josh, a professional freestyle motocross rider.

Following the Royals' World Series victory, the Yosts began planning for retirement and reassessing their long-term financial position, particularly with respect to the Yost property. In connection with financing discussions with Calumet Bank, James C. Clanton, MAI, and Robert E. Riggs II, of MVC Consulting, prepared an appraisal dated April 18, 2016. The appraisal analyzed the Yost property as two separate tracts: Tract A, consisting of approximately 251 acres, and Tract B, consisting of approximately 413 acres.[6] The appraisers valued Tract A at $1 million and Tract B at $1.32 million.

Around this same time, the Yosts retained real estate broker Robert Upchurch to market for sale a 251.014-acre portion of the Yost property, later referred to as the "Rising Rock property," which substantially corresponded to the Tract A identified in the appraisal.[7] On May 9, 2016, the Yosts listed the Rising Rock property on the Multiple Listing Service (MLS) for $991,450 based on Mr. Upchurch's recommendation. Mr. Upchurch derived the listing price from sales of comparable rural properties in the surrounding market.

Like the remainder of the Yost property, the Rising Rock property was rural and surrounded by agricultural and residential land. Most of the property was zoned A–1 Agricultural, with the remainder zoned low-density residential. These zoning classifications permitted agricultural activities, low-density residential development, and recreational uses. The property lies within the Cedar Rock Complex, an area known for multiple granite formations and visible granite outcroppings, from which the name "Rising Rock" was derived. Approximately 20 acres lie within a floodplain, an additional 20 acres consist of wetlands, and

---

[6] It is unclear from the record why the appraisers considered only 665.11 acres and not the entire 670.24 acres making up the Yost property.

[7] The record is unclear on exactly when the Yosts engaged Mr. Upchurch for assistance.

[*8] roughly 17% of the property contains moderately steep slopes exceeding 10% grade.

### 2. *Wingate and Schill*

William Wingate and Robert Schill entered the transaction from a markedly different perspective. Mr. Wingate had participated in more than 100 conservation easement transactions, approximately 20 of which were syndicated easements. He regularly sought rural properties for which mining could be asserted as the highest and best use.

Using geographical information systems (GIS) data, Mr. Wingate and Mr. Schill identified properties likely containing construction-grade granite aggregate. On the basis of his GIS analysis, Mr. Wingate understood that granite formations were widespread throughout Meriwether County and had previously consulted on several conservation easement transactions there in 2015.

After the Rising Rock property was listed for sale, Mr. Wingate and Mr. Schill contacted Mr. Upchurch regarding the property. Mr. Wingate and Mr. Schill were the only prospective purchasers to express interest in the Rising Rock property following its MLS listing. Mr. Upchurch referred them directly to the Yosts and their financial adviser to discuss a potential transaction.

### B. *Scouting the Rising Rock Property*

On August 8, 2016, the Yosts entered into a purchase agreement[8] to sell the Rising Rock property for $941,303 to an entity associated with Mr. Wingate and Mr. Schill and the soon-to-be-formed RRP. The agreement granted the buyer a 60-day due diligence period, including rights to conduct inspections, soil testing, and drilling and to terminate the contract for any reason with return of earnest money. At Mr. Yost's request, the property was removed from the MLS on August 20, 2016.

Mr. Wingate and Mr. Schill retained NOVA Engineering and Environmental, LLC (NOVA), to perform preliminary geotechnical exploration. NOVA engaged Premier Drilling, LLC, to drill four core holes between August 30 and September 1, 2016, reaching depths of 190.5 feet. GeoTesting Express analyzed the recovered samples.

---

[8] The contract involved Equity Trust Co./Custodian Joseph C. Freeman SEP IRA. This entity was one of the original members of RRP as discussed below.

**[\*9]** NOVA prepared a Geotechnical Engineering Report concluding that the subsurface rock met the Georgia Department of Transportation Group II, Type A, aggregate standards suitable for road construction. NOVA engineer Peter Keller testified that the report largely followed the standardized wording describing the testing procedures. No Phase I environmental site assessment or additional exploratory work was requested.

The testing results were forwarded to Richard Capps of Capps Geoscience, LLC, who was retained by Mr. Wingate and Mr. Schill to prepare a resource valuation report for the Rising Rock property and for a proposed conservation easement project. The Yosts also hired Dr. Capps to provide the same services for their easement project.

C.  *New Ownership*

On October 25, 2016, RRP was organized as a Georgia limited liability company. Robert Schill and Joseph Freeman III served as managers. Ownership interests were divided among four members: Robert Schill, LLC (25%), 240 Capital, LLC (25%), J.O. Middour, LLC (25%), and Equity Trust Co. Custodian FBO Joseph C. Freeman IRA 50% Undivided Interest (25%). On November 22, 2016, the Yosts[9] transferred the Rising Rock property to Ogletree Realty Trust for $941,303.

Following the acquisition, Mr. Wingate and Mr. Schill proceeded toward a conservation easement transaction premised on potential mining use. On September 7, 2017, Mr. Schill submitted a Surface Mining Application and Mining Land Use Plan to the Georgia Environmental Protection Division (GAEPD) Surface Mining Unit, the agency responsible for reviewing and issuing surface mining permits in Georgia.[10] By letter dated September 15, 2017, GAEPD requested additional information and responses by October 17, 2017. Mr. Schill

---

[9] The record does not clarify how Ogletree Realty Trust became the ultimate purchaser, as the purchase and sale agreement listed a different buyer.

[10] Georgia surface mining regulations also require applicants to address the potential effects of a proposed mining operation on properties listed on the National Register of Historic Places located within one mile of the proposed mine. Mr. Schill's application did not address the Mark Hall House, a National Register of Historic Places property, located approximately 0.45 mile from the proposed Rising Rock property surface mining site.

**[*10]** did not respond to GAEPD's comments, nor did he submit a revised application.[11]

### D. *RRP Takes the Field*

On November 21, 2017, Ogletree Realty Trust distributed undivided 25% ownership interests in the Rising Rock property to Mr. Schill, Mr. Wingate, Pensco Trust Co. FBO Joseph C. Freeman IRA, and John Middour. That same day, the grantees contributed their interests to RRP.[12] Also on November 21, 2017, Rising Rock Partner Investments, LLC (Rising Investments), was organized as a Georgia limited liability company.

Less than a month later, the members of RRP sold a 96% partnership interest to Rising Investments for $1,802,160. Following the transaction—and at the time of the conservation easement donation—Robert Schill, LLC, 240 Capital, LLC, J.O. Middour, LLC, and Pensco Trust Co. FBO Joseph C. Freeman IRA each retained a 1% interest in RRP, while Rising Investments owned the remaining 96%. Robert Schill, LLC, was manager of RRP.

### E. *The Pitch*

A private placement memorandum was circulated to prospective investors, offering interests in Rising Investments. Mr. Wingate and Mr. Schill promoted the transaction as a conservation easement investment projected to generate a 4.5-to-1 deduction ratio, meaning investors were advised they could expect approximately $4.50 in charitable contribution deductions for every $1 invested.

On December 19, 2017, RRP executed the Deed of Conservation Easement in favor of Oconee River Land Trust, Inc. (ORLT), an organization qualified at the time to receive tax deductible charitable contributions. Through this conveyance, RRP granted a conservation easement encumbering 226.014 acres of the Rising Rock property.

RRP retained Dale W. Hayter, Jr., and Clayton Weibel to prepare an appraisal of the property. Mr. Wingate regularly retained Mr.

---

[11] On February 21, 2018, RRP withdrew its mining permit application from GAEPD, requested that its status go inactive, and never received a mining permit from GAEPD.

[12] The record provides no explanation for the discrepancy between RRP's ownership and the persons and entities that contributed to the Rising Rock property.

[*11] Hayter as an appraiser for conservation easement transactions. Consistent with Mr. Wingate's and Mr. Schill's typical practice, the partnership relied upon the lower of the two valuation conclusions for reporting purposes—here, Mr. Hayter's valuation. Mr. Hayter concluded that the property's before easement value was $13,095,000, or $52,168 per acre, and that the conservation easement reduced the property's value by $12,765,000.[13]

Mr. Hayter acknowledged in his appraisal the November 16, 2016, purchase of the property for $941,303, but he did not reconcile that arm's-length transaction with his substantially higher valuation approximately one year later. In his preliminary appraisal—and in 12 additional appraisal reports involving properties in the same county— Mr. Hayter states that he spoke with a county official, Ron Garrett, who allegedly indicated that rezoning the parcels for industrial use was probable. Mr. Garrett testified that he did not recall speaking with Mr. Hayter regarding the Rising Rock property or the other parcels and that he had never heard of the Rising Rock property before this litigation. During RRP's ownership, no rezoning application was filed.

As of December 21, 2017—the date the conservation easement deed was recorded—Meriwether County assessed the Rising Rock property at a total fair market value of $662,300, consisting of $625,500 attributable to land and $36,800 attributable to improvements on the 251.014-acre parcel. The county assessment equates to approximately $2,492 per acre for the land.

F.      *RRP's Tax Return and Examination*

RRP timely filed Form 1065, U.S. Return of Partnership Income, for the tax year ending December 31, 2017. On that return RRP reported a noncash charitable contribution deduction of $12,765,000 for the conservation easement donation encumbering the Rising Rock property. At the time of filing, Robert Schill, LLC, served as the manager and tax matters partner. RRP attached to its return the preliminary appraisal report prepared by Mr. Hayter.

The IRS examined RRP's 2017 tax return, and on June 24, 2021, the IRS timely mailed an FPAA to Robert Schill, LLC, RRP's tax matters partner, disallowing the claimed $12,765,000 deduction and asserting a

[13] Mr. Hayter used the income approach and a sales comparison approach to make his determination. His sales comparison approach used operating mines as comparable sale properties.

[*12] penalty.[14]  Robert Schill, LLC, timely filed a petition under section 6226 on September 21, 2021, seeking readjustment of partnership items for the 2017 tax year.

III.   *The Yosts' Transaction*

During this same period, the Yosts learned of conservation easements and the associated tax deductions through Mr. Wingate and Mr. Schill.  After selling the Rising Rock property, the Yosts retained substantial acreage from the Yost property.  They decided to pursue their own conservation easement donation on a portion of the remaining property.  The Yosts engaged Mr. Wingate and Mr. Schill as consultants for the transaction.  The promoters provided access to a group of service providers regularly retained in their conservation easement projects.  In connection with the easement, the Yosts paid more than $200,000 in fees to various service providers, including an entity owned by Mr. Wingate and Mr. Schill.

On December 20, 2017, the Yosts donated a conservation easement in favor of ORLT encumbering 191.984 acres in Meriwether County (Yost easement).  The encumbered acreage formed part of the land the Yosts had acquired on January 31, 2011.

Mr. Hayter prepared a preliminary appraisal report valuing the Yost easement.  He concluded that the before easement value of the property was $13,915,000 ($52,168 per acre) and that the conservation easement reduced the property's value by $12,715,000.  Mr. Hayter's report did not reconcile his valuation with the Yosts' 2011 purchase of the property for $989,404 or with the November 2016 arm's-length sale of adjacent acreage for $941,303.  Mr. Yost testified that he was unaware of any sales of raw land in Meriwether County approaching $50,000 per acre.

The Yosts timely filed their Form 1040, U.S. Individual Income Tax Return, for tax year 2017.  They reported a charitable contribution of $12,715,000 attributable to the Yost easement.  The charitable contribution was carried forward and deducted over multiple tax years in varying amounts as follows:

---

[14] The parties stipulated the Commissioner's compliance with the requirements of section 6751(b)(1) for the penalty asserted in the FPAA.

**[*13]**

| 2017 | $1,546,632 |
|------|-----------|
| 2018 | 1,835,140 |
| 2019 | 1,494,161 |
| 2020 | 137,994 |
| 2021 | 164,657 |
| 2022 | 279,002 |
| 2023 | 135,726 |

On September 14, 2021, the IRS timely issued a Notice of Deficiency to the Yosts for tax years 2017 through 2019 disallowing the claimed charitable contribution deductions and determining deficiencies and penalties.[15] The Yosts timely petitioned this Court on December 13, 2021, seeking redetermination.

## IV.   *Expert Lineup*

The parties presented several expert witnesses at trial addressing the fair market value of the conservation easement. Each expert's written report was admitted as the witness's direct testimony pursuant to Rule 143(g)(2). We summarize the principal expert testimony below.

### A.   *Petitioner's Experts*

#### 1.   *F. Adam Nelson*

F. Adam Nelson, founder of the Nelson Law Group and an attorney admitted to practice law in Georgia and South Carolina, was qualified as an expert in Georgia zoning and land-use regulation. Mr. Nelson evaluated the regulatory framework governing the Rising Rock property and opined that development of a granite quarry was reasonably probable.[16] In his view, applicable zoning and permitting requirements would likely have allowed mining operations to proceed.

---

[15] The parties stipulated the Commissioner's compliance with the requirements of section 6751(b)(1) for each of the penalties determined in the Notice of Deficiency.

[16] We have disregarded Mr. Nelson's report to the extent it expresses legal conclusions. *See Alumax Inc. v. Commissioner*, 109 T.C. 133, 171 (1997) (holding that legal conclusions are not proper expert testimony), *aff'd*, 165 F.3d 822 (11th Cir. 1999).

**[\*14]**     2.     *Douglas R. Kenny*

Douglas R. Kenny, a certified general real estate appraiser with Kenny & Associates, Inc., was qualified as an expert in real estate valuation, including appraisal of mineral properties.

Mr. Kenny valued the easement using the "before and after" method.  He determined a before value of $12,650,000 for the Rising Rock property, relying primarily on an income approach premised on quarry development.  Mr. Kenny's discounted cashflow model assumed total sales tons ranged from a low of zero tons to a maximum of 713,000 tons. His analysis incorporated elements of the sales comparison approach and a royalty method to support projected income assumptions.  Mr. Kenny, applying the sales comparison approach, concluded that the property's after value was $570,000, resulting in an easement value of $12,080,000.  He determined that the highest and best use of the property before the easement was granite mining, and that agricultural, recreational, or forestry use represented the highest and best use after the easement.

In his rebuttal report Mr. Kenny criticized Thomas Hamilton's appraisal, asserting that Dr. Hamilton's conclusions were inconsistent with accepted appraisal standards and rested on flawed analyses of legal permissibility and financial feasibility.

3.     *Gregory M. Stanish*

Gregory M. Stanish, director of geological services and a designated expert for John T. Boyd Co., a mining and geological consultancy firm, was qualified as an expert in the identification and quantification of mineral resources, with specific experience in construction aggregates.

Mr. Stanish prepared a mineral reserves analysis of the Rising Rock property.  He opined that approximately 9.3 million run-of-mine tons of probable granite reserves were present within the proposed mining pit area.  In developing his analysis, Mr. Stanish consulted with Michael Wick regarding the layout of a proposed quarry and processing facility.

4.     *Michael F. Wick*

Michael F. Wick, vice president and a designated expert for John T. Boyd Co., was qualified as an expert in the crushed-stone aggregate

[*15] industry, mineral market analysis, and valuation of mineral reserves. Mr. Wick determined the mineral property value of the Rising Rock property was approximately $14.9 million applying the income approach. His income approach, specifically the discounted cashflow model, assumed total sales tons ranged from a low of 100,000 tons in Year 1 to a maximum of 678,000 tons in Year 16 and required capital expenditures exceeding $15 million for the development of an operating quarry on the Rising Rock property.

Mr. Wick's rebuttal report criticized Brian Groff's report, stating that contrary to Mr. Groff's belief, the Rising Rock property occupied a favorable location for aggregate production and that market demand extended beyond local population indicators. He further concluded that rezoning approvals for mining operations were reasonably likely.

B. *Respondent's Experts*

1. *Dr. Hamilton*

Dr. Hamilton, executive vice president of JLL Valuation & Risk Advisory Services, LLC, was qualified as an expert in real estate appraisal and market studies. He valued the conservation easement using the "before and after" method. Dr. Hamilton concluded that the Rising Rock property had a fair market value of $954,000, or $3,800 per acre, before the easement. He determined that the conservation easement reduced the property's value by $625,000. Dr. Hamilton concluded that the highest and best use of the property before the easement was low-density residential and recreational uses rather than mining.

In rebuttal Dr. Hamilton identified several perceived deficiencies in Mr. Kenny's analysis, including reliance on a discounted cashflow model, limited use of comparable sales data, failure to account for recent arm's-length sales of the subject property, and insufficient market supply-and-demand analysis.

2. *Mr. Groff*

Mr. Groff, a licensed professional engineer with a degree in mining engineering, was qualified as an expert in mining engineering and the valuation of mineral properties. He opined that the Rising Rock property was not an economically attractive location for quarry development. He cited distance to end markets, limited transportation

**[\*16]** infrastructure, low regional population density, and the absence of demonstrated unmet aggregate demand.

In rebuttal, Mr. Groff criticized the analyses of Mr. Kenny, Mr. Nelson, Mr. Stanish, and Mr. Wick, concluding that the available geological and economic data did not support classification of the site as commercially viable mineral reserves. He further opined that the income and discounted cashflow methodologies employed by petitioner's experts failed to adequately account for risk and lacked necessary sensitivity analyses.

### 3. *Raymond H. Krasinski*

Raymond H. Krasinski, a licensed real estate appraiser and lead appraiser at the IRS, was qualified as an expert in appraisal, appraisal review, Uniform Standards of Professional Appraisal Practice, and real estate market analysis. His rebuttal report critiqued Mr. Kenny's report. He concluded that Mr. Kenny's valuation did not reflect market-oriented value of the Rising Rock property in its condition as of the donation date. Mr. Krasinski further opined that the report failed to adequately recognize that the property was one of many large vacant agricultural tracts situated within a granite-rich region, offering buyers multiple comparable alternatives.

### OPINION

## I. *Burden of Proof*

The IRS's adjustments in an FPAA are generally presumed correct, and the taxpayer bears the burden of proving those adjustments erroneous. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013); *see also* Rule 142(a)(1). That burden includes proving entitlement to any deduction claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Deductions are a matter of legislative grace; therefore, a taxpayer must demonstrate compliance with the statutory requirements authorizing the deduction. *See id.* at 84.

Accordingly, petitioner bears the burden of proving both entitlement to a charitable contribution deduction under section 170 for a qualified conservation contribution and the fair market value of the donated conservation easement. *See Jackson Stone S., LLC v. Commissioner*, T.C. Memo. 2025-96, at \*65; *Buckelew Farm, LLC v.*

**[\*17]** *Commissioner*, T.C. Memo. 2024-52, at \*39, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sep. 2, 2025).

## II.  *Charitable Contribution Deduction*

### A.  *Valuation Principles*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year.  When a taxpayer contributes property other than cash, the amount of the allowable deduction generally equals the property's fair market value at the time of the gift.  *See* Treas. Reg. § 1.170A-1(c)(1).  Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* subpara. (2).

Valuation is not an exact science.  The determination of a value on a given date is a question of fact resolved on the basis of the entire record.  *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).  Because comparable market sales of conservation easements are rarely available, courts ordinarily determine the value of a conservation easement indirectly using the "before and after" method.  *See Ranch Springs, LLC v. Commissioner*, 164 T.C. 93, 128 (2025); Treas. Reg. § 1.170A-14(h)(3)(i).  Under this method, the value of an easement equals the fair market value of the property immediately before the easement is granted (before value) minus the fair market value of the property as encumbered by the easement (after value).  *Ranch Springs*, 164 T.C. at 128.

Treasury Regulation § 1.170A-14(h)(3)(i) provides that when a perpetual conservation easement encumbers only a portion of a contiguous tract owned by the donor, the fair market value of the restriction is the difference between the fair market value of the entire contiguous parcel before and after the restriction is granted.  Both parties apply this rule and value the conservation easement with reference to the 251.014-acre Rising Rock property.  We will do the same.

Both parties rely extensively on expert testimony.  We evaluate an expert's opinion in the light of the expert's qualifications, the reliability of the underlying data, and the soundness of the assumptions employed.  *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Estate of Mellinger v. Commissioner*, 112 T.C. 26, 39 (1999); *Estate of Davis v. Commissioner*, 110 T.C. 530, 538 (1998).  We are not bound to

**[\*18]** accept an expert's opinion in whole or in part. Instead, we may accept those portions we find reliable and reject those we find unpersuasive. *Helvering v. Nat'l Grocery Co.*, 304 U.S. at 295; *Estate of Hall v. Commissioner*, 92 T.C. 312, 338 (1989); *see also Leonard Pipeline Contractors v. Commissioner*, 210 F.3d 384 (9th Cir. 2000) (unpublished table decision) ("The Tax Court could either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective potions [sic] of it."). We also "may determine fair market value on the basis of our own examination of the evidence in the record." *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*35; *see also Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111, at \*35, *aff'd*, Nos. 25-10744, et al., 2026 WL 822261 (11th Cir. Mar. 25, 2026); *Buckelew Farm*, T.C. Memo. 2024-52, at \*51.

The parties agree that the valuation should proceed under the before and after method. Their disagreement centers on how the before value should be determined. Respondent's expert, Dr. Hamilton, applied a market approach (sales comparison). Petitioner's experts, Mr. Kenny and Mr. Wick, relied on an income approach employing discounted cashflow analysis premised on quarry development.[17] The selection of an appropriate valuation methodology is ultimately a question of law informed by the facts of the case. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013).

### B. *"Before Value" of the Rising Rock Property*

To determine the property's "before value," we begin by identifying the property's highest and best use immediately before the conservation easement was granted. After identifying that use, we evaluate relevant market evidence, prior transactions involving the property, and the competing valuation methodologies advanced by the parties' experts.

#### 1. *Determination of Highest and Best Use*

Under the before and after valuation method, fair market value reflects not only the property's existing use but also its highest and best use. *See Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). Highest and best use is the reasonably probable use that is legally permissible, physically

---

[17] In his report, Mr. Kenny used a discounted cashflow analysis as the primary method for valuing the Rising Rock property with a sales comparison approach as a "test of reasonableness," or secondary method.

[*19] possible, financially feasible, and maximally productive. *Ranch Springs*, 164 T.C. at 136; *see also Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington v. Commissioner*, 87 T.C. 892, 897 (1986). A property's current use is presumed to be its highest and best use absent evidence to the contrary. *Mountanos v. Commissioner*, T.C. Memo. 2013-138, at *7, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016); *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 2012 WL 371809, at *7, *aff'd*, 744 F.3d 648 (10th Cir. 2014). A proposed alternative highest and best use must be reasonably probable, not merely speculative. *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985). We exclude from consideration uses dependent upon uncertain future events or contingencies that are only theoretically possible. *Olson*, 292 U.S. at 257.

Determining highest and best use therefore requires an objective assessment of the likelihood, absent the conservation restriction, the property would have been developed as proposed, considering existing zoning limitations, regulatory constraints, and market realities. Treas. Reg. § 1.170A-14(h)(3)(ii). Although highest and best use is an important component of valuation, it does not displace the governing willing buyer, willing seller standard. *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011). The ultimate question remains whether a hypothetical purchaser would pay the asserted price for the property under prevailing market conditions. *Id.*; *see Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at *41, *aff'd*, 158 F.4th 715 (6th Cir. 2025); Treas. Reg. § 1.170A-1(c)(2).

Petitioner argues that applying traditional fair market value principles to conservation easements misapplies the governing legal standard. According to petitioner, a perpetual restriction on real property warrants a more stringent valuation standard because the donor relinquishes the value inherent in the property's highest and best use. In petitioner's view, valuing the easement by reference to the property's highest and best use more accurately measures the value surrendered through the perpetual restriction. We disagree. Our precedent consistently applies established fair market value principles—including highest and best use analysis—in valuing conservation easements, and we adhere to that framework here. *See Boltar*, 136 T.C. at 336; *see also Ranch Springs*, 164 T.C. at 161. In any event, even if we accepted petitioner's premise, we would still conclude that the property's highest and best use was not mining, for the reasons discussed below.

[*20]                             a.    *Legally Permissible*

The Rising Rock property lies in a rural area, surrounded by agricultural and residential land.  In 2016 and 2017 it was zoned partly A–1 Agricultural and partly low-density residential.[18]  These zoning classifications permitted farming, forestry, low-density residential development, and recreational uses but did not permit quarry mining or other industrial uses.  The property was used primarily for recreational purposes when RRP acquired it.  Recreational use was thus its presumptive highest and best use in December 2017.  *See Ranch Springs*, 164 T.C. at 137; *see also N. Donald LA Prop., LLC v. Commissioner*, T.C. Memo. 2026-19, at \*46.

Respondent's expert, Dr. Hamilton, evaluated potential alternative uses and, after considering market factors and obstacles to rezoning, concluded that the property's highest and best use before the easement consisted of low-density residential combined with recreational use.  We adopt that conclusion.  Limiting the analysis to recreational use alone fails to account for the property's residential development potential and therefore does not reflect a maximally productive use.  Low-density residential use is consistent with surrounding land uses, where large-acreage tracts are typically purchased for recreation, hunting, forestry, or estate-style residential development.

Petitioner contends that the highest and best use was development of a granite quarry.  Quarry mining, however, was not legally permissible under existing zoning.  Petitioner therefore bears the burden of establishing that rezoning and issuance of necessary permits were reasonably probable.  The record does not support such a finding.

Between RRP and Ogletree Realty Trust, the property was owned for more than a year before RRP donated the easement, yet neither party made any effort to obtain a text amendment, rezoning, or a special use permit.  No applications were filed, no preliminary discussions with

---

[18] The parties stipulated the zoning classifications.  However, Dr. Hamilton identified a zoning discrepancy in his report.  Upon verifying with a Meriwether County official, he was informed that the parcel was entirely zoned A–1 Agricultural as of the valuation date in 2017.  Dr. Hamilton compared the A–1 Agricultural and low-density residential classifications and determined that the principal distinction between them was minimum lot size—25 acres for A–1 Agricultural and 5 acres for low-density residential.  The Rising Rock property meets the minimum lot size requirement under either classification; therefore, Dr. Hamilton concluded that the property's marketability would be unaffected.

[*21] county officials were initiated, and no community outreach was attempted. The absence of these actions is significant given the extensive regulatory approvals required for quarry development.

Petitioner relies primarily on the testimony of Mr. Nelson, who opined that rezoning could have been obtained if properly pursued. His opinion assumes successful completion of multiple discretionary government actions, including a text amendment, rezoning approval, and issuance of a special use permit. His report, however, does not meaningfully analyze the factors Meriwether County is required to consider under its zoning ordinance. *See* Code of Ordinances, Meriwether Cnty., Ga., App. A § 16.8 (2016). Those factors include compatibility with surrounding land uses, infrastructure impacts, conformity with the land-use plan, and economic viability under existing zoning. Application of these considerations weighs strongly against industrial rezoning of the Rising Rock property. Surrounding properties were zoned A–1 Agricultural and low-density residential, and quarry operations would introduce heavy truck traffic, blasting, noise, and dust incompatible with neighboring rural uses. County roadways in the vicinity were not designed to accommodate sustained industrial hauling operations. Nothing in the record indicates changing land-use conditions favoring industrial development.

Evidence concerning contemporaneous quarry proposals elsewhere in the county further undermines petitioner's position. Testimony regarding Mr. Fitzgerald's quarry proposal demonstrated substantial and organized community opposition to mining projects during the relevant period.[19] Residents mobilized extensively, retained counsel and consultants, and participated in large public hearings.[20]

---

[19] Petitioner filed a motion in limine to exclude evidence of Mr. Fitzgerald's attempt to rezone his Meriwether County property. On March 31, 2025, the Court denied the motion without prejudice. In a footnote in petitioner's simultaneous opening brief, petitioner renewed its motion. We find Mr. Fitzgerald's testimony relevant, and it will not be excluded.

[20] In *Harman Road Property, LLC v. Commissioner*, T.C. Memo. 2026-23, at *33, this Court was reluctant to give weight to the evidence regarding Mr. Fitzgerald's rezoning attempt because his efforts were undertaken in 2017 and 2018, which was after the 2016 tax year at issue in that case. *See Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987) ("In general, property is valued as of the valuation date on the basis of market conditions and facts available on that date without regard to hindsight." (emphasis omitted)). Here, we do give weight to Mr. Fitzgerald's attempt because it occurred contemporaneously with the RRP easement donation. His attempt

**[\*22]** Petitioner attempts to distinguish Mr. Fitzgerald's experience as unique to that project. We are not persuaded. The record demonstrates widespread resistance to quarry mining throughout the county. Testimony from county officials confirmed that the denial of Mr. Fitzgerald's proposal was not attributable to personality conflicts or procedural missteps but rather to sustained public opposition and zoning considerations. County residents expressed concern regarding environmental impacts, traffic, and preservation of the county's rural character.

We therefore find that rezoning for quarry development was not reasonably probable as of December 2017. Quarry mining was not a legally permissible or reasonably probable use. Considering existing zoning restrictions, the absence of any successful rezoning efforts, the discretionary nature of governmental approvals, and substantial community opposition to quarry development within Meriwether County during the relevant period, we find that a hypothetical willing buyer would not have purchased the Rising Rock property based on an expectation of quarry development. Therefore, the mining potential would not have influenced market price as of the valuation date and cannot constitute the property's highest and best use.

b. *Physical Possibility*

The property's physical characteristics further weigh against industrial development. More than 15% of the property either lies in a floodplain or consists of wetlands, and approximately 17% of the property contains slopes exceeding 10% grade. These conditions reduce suitability for large-scale industrial operations.

The record supports that certain agricultural or forestry uses—particularly timber harvesting—may be financially feasible. Traditional agricultural operations such as livestock grazing or row-crop farming are less likely given the limited pastureland available on the property.

c. *Financial Feasibility*

Because quarry development was not legally permissible or reasonably probable, further analysis of financial feasibility is not required. We nevertheless address financial feasibility to demonstrate

---

highlights the uncertainty of amending zoning laws in Meriwether County and offers insight into the views of local residents at the time of the RRP donation.

**[\*23]** that, even assuming rezoning approval, petitioner has not established that quarry development would have been economically viable. Petitioner's experts relied on income and discounted cashflow analyses premised on annual production ranging from 100,000 tons to upwards of 713,000 tons. The critical flaw in those analyses is the unsupported assumption that the local market could absorb additional supply at that level. *See Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7–8. (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

Demand for construction aggregate is driven primarily by local population growth, housing construction, and regional economic activity. In 2016 and 2017 Meriwether County experienced declining population trends, stagnant median income levels, and minimal residential construction activity. Only a small number of housing permits were issued countywide.

Although broader regional projections suggested population growth across a larger multicounty area, those projections overstated the realistic market available to a quarry located on the Rising Rock property. Adjacent counties with population growth already hosted quarry operations, and competing facilities were located closer to primary demand centers. Crushed stone is highly sensitive to transportation costs, resulting in quarries typically operating near their markets. Evidence concerning Vulcan's LaGrange quarry is instructive. Despite being an established operator, the LaGrange facility operated substantially below capacity because of insufficient local demand and primarily served nearby markets rather than more distant metropolitan areas.

A new quarry at the Rising Rock property would have faced longer haul distances, higher transportation costs, and competition from multiple existing quarries. The record does not establish unmet demand sufficient to support a new operation. A quarry cannot create demand where none exists. Moreover, petitioner's own evidence indicated that development of an operating quarry at the Rising Rock property would require capital expenditures exceeding $15 million.

The objective market evidence demonstrates that existing quarry operators possessed unused production capacity, regional demand for aggregate was stagnant or declining, and transportation economics favored established competitors located closer to primary markets. Under these conditions, a rational purchaser would not undertake the

[*24] substantial capital investment required to develop a new quarry on the Rising Rock property. Accordingly, quarry development would not have been considered financially feasible by a hypothetical willing buyer.

d. *Highest and Best Use Conclusion*

Considering the zoning restrictions, the lack of reasonably probable rezoning, the property's physical characteristics, the absence of market demand sufficient to support a new quarry, and the economic realities facing aggregate producers in the relevant market area, we conclude that a knowledgeable and willing buyer would have valued the Rising Rock property for low-density residential and recreational purposes rather than for mining development. Accordingly, we find that the highest and best use of the Rising Rock property immediately before the conservation easement donation was low-density residential and recreational use.

2. *Prior Transactions Involving the Property*

Before considering the valuation approaches advanced by the parties, we begin with the most probative evidence of fair market value: The price at which it changed hands in an arm's-length sale occurring reasonably close to the valuation date. *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *see also J L Mins., LLC v. Commissioner*, T.C. Memo. 2024-93, at *55; *Corning Place*, T.C. Memo. 2024-72, at *28; *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *31 ("The best evidence of a property's [fair market value] is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at *14. Courts consistently give substantial weight to such transactions because they reflect the price that actual market participants were willing to pay under prevailing market conditions. *See, e.g.*, *Corning Place*, T.C. Memo. 2024-72, at *28; *Wortmann v. Commissioner*, T.C. Memo. 2005-227, 2005 WL 2387487, at *10 (finding that the most persuasive evidence of the property's fair market value was its actual sale price 17 months before the contribution).

Both this Court and the U.S. Court of Appeals for the Eleventh Circuit have recognized that the purchase of a partnership interest may provide reliable evidence of value when the partnership's sole or primary asset consists of the subject property itself. *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *see also TOT Prop. Holdings, LLC v. Commissioner*,

[*25] 1 F.4th 1354, 1368, 1371 n.23 (11th Cir. 2021) (finding that the sale price for a 98.99% interest in a partnership whose only meaningful asset was property on which an easement was granted shortly thereafter was representative of the "before" value of the property); *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *71–72, *supplemented by* T.C. Memo. 2024-73. Market evidence and appraisal approaches should generally reinforce one another rather than produce widely divergent results. *See Ranch Springs*, 164 T.C. at 134; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32.

a.      *Arm's-Length Sale of the Rising Rock Property*

The record contains an arm's-length sale of the Rising Rock property occurring approximately 13 months before the conservation easement donation. The Yosts listed the 251.014-acre parcel on the MLS for $991,450 as part of their broader retirement plans. After remaining on the market for more than three months, the property was sold on November 22, 2016, to Ogletree Realty Trust for $941,303, or approximately $3,750 per acre. The parties do not dispute that the Yosts and Ogletree Realty Trust were unrelated parties engaged in a negotiated market transaction. Given its proximity to the valuation date and its arm's-length nature, this sale constitutes the most probative evidence in the record of the property's fair market value.

b.      *Sale of RRP Partnership Interests*

We also consider the subsequent sale of partnership interests in RRP as a corroborating measure of market value. Six days before the easement donation, Rising Investments purchased a 96% interest in RRP for $1,802,160. At the time, the partnership's sole asset was the Rising Rock property. The transaction therefore provides additional evidence of what investors were willing to pay for indirect ownership of the property.

While the purchase price exceeded the earlier acquisition price paid for the property, that increase may reflect some combination of modest appreciation and the anticipated tax benefits associated with the conservation easement transaction. Even so, the implied value remains far closer to the arm's-length sale price than to petitioner's substantially higher valuation derived from income-based projections.

**[\*26]**          3.          *Valuation Approaches*

Although actual market transactions provide the most persuasive evidence of value, courts may also consider traditional appraisal methodologies.   The principal valuation approaches consist of the market approach, the income approach, and the asset-based approach.[21] *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). The usefulness of any approach depends on the nature of the property and the facts of the case.  *See Chapman Glen Ltd.*, 140 T.C. at 325–26; *Champions Retreat Golf Founders, LLC v. Commissioner*, T.C. Memo. 2022-106, at \*21, *supplementing* T.C. Memo. 2018-146.

The market approach estimates fair market value by reference to arm's-length sales of comparable properties occurring reasonably close in time to the valuation date.  *See Chapman Glen Ltd.*, 140 T.C. at 326. Because no two properties are identical, the appraiser must adjust comparable sales to account for differences such as size, location, development potential, and conditions of sale.  *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979).

The reliability of a comparable sales analysis depends on the comparability of the selected properties and the reasonableness of the adjustments made.  *Id.* at 19–20.  The approach rests on the economic principle of substitution—that a prudent buyer will not pay more for a property than the cost of acquiring a reasonably comparable substitute. *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*51; *see also Buckelew Farm*, T.C. Memo. 2024-52, at \*50 n.25, \*55 ("[T]he principle of substitution . . . stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less."); *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119 ("[A] prudent man will pay no more for a given property than he would for a similar property."), *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision).

For vacant or lightly improved land, the market approach is generally regarded as the most reliable valuation method because it reflects the collective judgment of actual buyers and sellers operating in

---

[21] Neither party uses the asset-based approach to value the easement.  We agree that the asset-based approach is not relevant.

[*27] the marketplace. *See Oconee Landing*, T.C. Memo. 2024-25, at \*67; *Estate of Rabe*, 34 T.C.M. (CCH) at 119. Identification of appropriate comparable sales is guided by the property's highest and best use. *Corning Place*, T.C. Memo. 2024-72, at \*32.

The income approach estimates fair market value by discounting to present value the expected future cashflows the property would generate. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision). This approach is most reliable where the projections rest on a credible foundation, including market data and supportable assumptions about cost, timing, and risk. *Ranch Springs*, 164 T.C. at 151; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*33.

We have observed that the income approach is often most reliable when applied to an existing income-producing business with a track record of revenues and expenses. *See Ranch Springs*, 164 T.C. at 151. When applied to vacant land, the approach can be highly sensitive to assumptions, and unsupported projections have undermined income analyses in many conservation easement cases. *See, e.g.*, *Savannah Shoals*, T.C. Memo. 2024-35, at \*36 ("Income valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable."). For that reason, we must carefully examine the plausibility of the critical assumptions underlying the model. *See Ranch Springs*, 164 T.C. at 151; *Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, slip op. at 10–11.

The choice of valuation method is influenced in significant part by the property's highest and best use. Consistent with our determination that the Rising Rock's property's highest and best use before the easement consisted of low-density residential and recreational use, we evaluate the parties' expert analyses in the light of that conclusion.

a.    *Market Approach*

i.    *Dr. Hamilton's Comparable Sales*

Dr. Hamilton concluded that, before the easement donation, the Rising Rock property's highest and best use was low-density residential combined with recreational use. To estimate value under the market approach, he selected sales of rural tracts purchased or marketed for

[*28] similar uses. He relied on four arm's-length comparable sales, identified as Land Sales 1 through 4:

- Land Sale 1 (November 2016): Involved the Rising Rock property itself (Yost sale to Ogletree Realty Trust); 251.014-acre tract located south of Ogletree Road between Old Durand Road and Winter Road; zoned A–1 Agricultural and low-density residential; contained hardwood and pine timber, open areas, multiple streams and creeks, and rolling to moderately steep terrain; parcel is situated atop granite formations; sold for $941,303, or $3,750 per acre.

- Land Sale 2 (February 2017): 155.34-acre tract located on Jessie Porch Road approximately six miles northeast of the Rising Rock property; zoned low-density residential and featured hardwood and pine timber with rolling to moderately steep topography and minimal thinned areas; sat atop granite formations but lacked natural water features; sold for $547,577, or $3,525 per acre.

- Land Sale 3 (September 2016): 221.16-acre parcel on Oakland Road near Gay, Georgia, approximately 20 miles northeast of the Rising Rock property; zoned low-density residential and consisted of hardwood and pine timber with generally level-to-sloping terrain; granite subsurface conditions were present, although no natural water amenities were noted; sold for $750,000, or $3,391 per acre.

- Land Sale 4 (February 2017): 369.11-acre parcel on Jessie Porch Road, approximately six miles northeast of the Rising Rock property; zoned low-density residential and contained hardwood and pine timber, thinned and open areas, limited creeks and streams, and rolling to moderately steep topography; granite formations were present; sold for $1,301,106, or $3,525 per acre.

Dr. Hamilton adjusted each comparable for differences including property rights conveyed, financing terms, conditions of sale, date of sale, location, tract size, road frontage, natural water amenities, and other physical characteristics. After adjustment, he derived the following indicated values:

- Land Sale 1: $978,955, or $3,900 per acre.

- Land Sale 2: $597,845, or $3,849 per acre.

[*29]

- Land Sale 3: $826,875, or $3,739 per acre.

- Land Sale 4: $1,393,745, or $3,776 per acre.

The adjusted comparables produced a mean value of approximately $3,797 per acre, and a median of $3,793 per acre. Dr. Hamilton concluded that the Rising Rock property had a before easement value of $3,800 per acre, yielding a total value of approximately $954,000 for the 251.014-acre tract.

ii.    *Mr. Kenny's Comparable Sales*

Mr. Kenny reached a markedly different conclusion. He relied on a discounted cashflow analysis supported by six purported comparable mining property transactions in Carroll, Jackson, Hall, Athens-Clarke, Forsyth, and Fulton Counties. Five of the six properties were either operating mines with established production histories or expansion acquisitions adjacent to existing mining operations. The sixth was a greenfield parcel possessing zoning approvals allowing mineral extraction. The transactions reflected prices ranging from $75,950 to $291,325 per acre. On the basis of those sales and his discounted cashflow modeling, Mr. Kenny concluded that the Rising Rock property had a before easement value of $50,396 per acre as of December 21, 2017.

Petitioner's primary argument against Dr. Hamilton's comparables is that they do not account for the mining highest and best use and ignore the presence and value of the subsurface mineral on the Rising Rock property. We have already rejected that premise. The record does not establish that mining was reasonably probable or legally permissible as of the valuation date.

Even if mining were assumed to be the highest and best use, Mr. Kenny's selected comparables remain unpersuasive. His comparable properties were either zoned for mining, functioning commercial mines, or expansion acquisitions benefiting from extensive geological data, regulatory approvals, and established operating infrastructure. Those characteristics materially reduce risk relative to the Rising Rock property, which lacks mining entitlements, meaningful drilling data, and verified mineral reserves.

**[\*30]** Mr. Kenny offered no persuasive evidence that market participants would pay more than $50,000 per acre for raw rural land possessing only limited exploratory information and no mineral approvals. Nor did he analyze market conditions in the counties where his comparables were located or explain their economic comparability to Meriwether County. Accordingly, we give little weight to Mr. Kenny's valuation.

### iii. *Our Analysis*

We find Dr. Hamilton's comparable property sales reliable. Each involved vacant rural acreage within the same market area, sharing the subject property's highest and best use, physical characteristics, and development potential. The sales' proximity in both time and location accords with accepted appraisal methodology and our precedent.

Land Sale 1 is the most probative evidence of value because it represents the prior arm's-length sale of the Rising Rock property itself, occurring only 13 months before the valuation date. We have repeatedly recognized that an actual sale of the subject property, when reasonably close in time and free from compulsion, provides the best indicator of market value. *See, e.g.*, *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*31; *ES NPA Holding*, T.C. Memo. 2023-55, at \*14.

The remaining sales selected by Dr. Hamilton provide meaningful corroboration. Land Sale 2 occurred ten months before the donation. The Land Sale 2 property lies only six miles from the Rising Rock property within the same county, shares similar zoning, topography, and granite subsurface conditions, and differs primarily in lacking natural water features, rendering it slightly inferior to the Rising Rock property. The Land Sale 3 property, though located farther away, remains within Meriwether County and is similar in size and zoning classification. Its somewhat more level terrain suggests modest superiority, while the absence of natural water amenities offsets that advantage. The Land Sale 4 property is larger than the Rising Rock property but remains comparable in overall character. Located only six miles away and sold within the relevant valuation period, it shares similar terrain, mineral conditions, and rural residential potential.

Independent market evidence further supports Dr. Hamilton's conclusions. Mr. Upchurch, a licensed real estate broker familiar with the local market, advised the Yosts in 2016 to list the property at approximately $3,950 per acre, or $991,450, based on comparable

**[\*31]** transactions. A 2016 appraisal prepared for Calumet Bank conducted shortly before the MLS listing indicated a value of approximately $3,970 per acre, or $1 million for the 251-acre tract. These opinions from knowledgeable market participants corroborate the value range indicated by the comparable property sales analysis.

Although Dr. Hamilton ultimately adopted $3,800 per acre, we give the greatest weight to Land Sale 1—the prior sale of the subject property. Because the transaction occurred only 13 months before the donation date and the record reflects modest appreciation during the intervening period, we adopt the adjusted indication of $3,900 per acre. Accordingly, we find that the Rising Rock property had a before easement fair market value of $3,900 per acre as of the valuation date.

b.  *Income Approach*

Petitioner's experts Mr. Kenny and Mr. Wick valued the Rising Rock property using income-based methodologies premised on development of a granite quarry. Each concluded that the property's highest and best use was aggregate mining and constructed valuation models intended to measure present value of a hypothetical quarrying operation.

We have already determined that granite mining was not the property's highest and best use because petitioner failed to establish that mining was legally permissible or reasonably probable as of the valuation date. That determination is dispositive of the income approach.

The discounted cashflow analyses prepared by Mr. Kenny and Mr. Wick assume the creation of a long-term mining enterprise and project revenues, expenses, capital investments, and market demand over periods ranging from 17 to 19 years. Because those projections depend entirely on a use that was not legally feasible, the resulting valuations do not reflect the price that a willing buyer would have paid for the property in its actual condition. We therefore give no weight to the discounted cashflow analyses.

Petitioner also presented a royalty income analysis estimating the value of leasing the property for quarry operations. This method likewise presumes the existence of a viable mining use. For the same reason that undermines the discounted cashflow models, the royalty analysis rests on an unsupported premise and does not assist us in determining fair market value.

**[\*32]** Even if mining were assumed to be the highest and best use, both income approaches would remain unpersuasive. Each relies on speculative forecasts concerning future production levels, market demand, and operating performance extending decades into the future. *See Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968) (rejecting real estate valuation premised on the income approach in favor of market value established by recent sales), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *J L Mins.*, T.C. Memo. 2024-93, at \*56 (finding that the income approach would be inappropriate even if mining were the property's highest and best use); *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*40 (same). Where reliable comparable sales exist— as they do here—the market approach provides a far more reliable measure of value than projections of a hypothetical business enterprise. Accordingly, we place no weight on petitioner's income-based valuations and rely instead on the market evidence discussed above.

### C. *Value of the Easement*

Fair market value reflects the price at which a willing buyer and a willing seller, neither under compulsion and both possessing reasonable knowledge of relevant facts, would agree to exchange the property. The record before us contains precisely the type of evidence most probative of that inquiry—recent arm's-length sales of comparable rural acreage, including a recent prior sale of the subject property itself. Giving the greatest weight to the prior arm's-length sale of the subject property and the corroborating comparable sales analyzed by Dr. Hamilton, we conclude that the Rising Rock property had a before easement fair market value of $3,900 per acre, or $978,955 in total.

In determining the value of the property after encumbrance by the easement, we note that Dr. Hamilton concluded an "after value" of $329,000. This figure is lower than the value proposed by Mr. Kenny.[22] Therefore, we treat the Commissioner as having effectively conceded an after value of $329,000. *See Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at \*76.

The value of the conservation easement was thus $649,955.

### III. *Penalties*

Section 6662 imposes a 20% accuracy-related penalty on any portion of an underpayment attributable to substantial valuation

---

[22] Mr. Wick does not provide an "after value."

[*33] misstatement. § 6662(a), (b)(3).  A misstatement is "substantial" if the value of the property claimed on a return equals or exceeds 150% of the correct amount.  § 6662(e)(1)(A).  The penalty increases to 40% in the case of a "gross valuation misstatement," which occurs when the claimed value equals or exceeds 200% of the correct value. § 6662(h)(2)(A)(i).

RRP claimed a charitable contribution deduction of $12,765,000 for the conservation easement on its 2017 return.  We have determined that the easement's fair market value on the valuation date was $649,955.  The claimed value therefore exceeded 1,900% of the correct value, constituting a gross valuation misstatement within the meaning of section 6662(h).

Section 6664(c)(1) generally provides that no accuracy-related penalty shall apply if the taxpayer demonstrates reasonable cause and good faith.  However, that defense is unavailable for gross valuation misstatements attributable to charitable deduction property. § 6664(c)(3).  Accordingly, the 40% gross valuation misstatement penalty applies to the portion of RRP's underpayment attributable to the overvaluation of the conservation easement.

On the basis of the Court's valuation determination in RRP's case, gross valuation misstatement penalties also apply to the portions of the Yosts' underpayments attributable to the overvaluation of the conservation easement.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*